Audrey E. LIEBENSTEIN, Individually, and as Personal Representative of the Estate of Robert D. Liebenstein, Bert Liebenstein, Individually, and the Estate of Robert D. Liebenstein, Plaintiffs,

v.

Charles W. CROWE, Jr., James M. Knowles, Rodney Galbraith, Donald Theisen, Ozaukee County, Lloyds of London, St. Paul Insurance Company, City of Port Washington, and Scottsdale Insurance Company, Defendants.

No. 89–C–782.

United States District Court, E.D. Wisconsin.

Sept. 4, 1992.

Thadd J. Llaurado, Don C. Prachthauser, Gillick, Murphy, Wicht & Prachthauser, Milwaukee, WI, for plaintiffs.

Harold A. Laufer, William E. Callahan, Jr., Maria K. Myers, Davis & Kuelthau, Milwaukee, WI, for defendants Crowe, Knowles, Galbraith, Ozaukee County, Lloyds of London Ins. Co. and St. Paul Ins. Co.

Philip C. Reid, Robert F. Johnson, Cook & Franke, Milwaukee, WI, for defendants Theisen, Scottsdale Ins. Co. and City of Port Washington.

### DECISION AND ORDER

WARREN, Senior District Judge.

This is a wrongful death action brought by the parents of Robert Liebenstein, who was shot and killed by police in front of his home in the early hours of October 16, 1989.[1]  The defendants, who are law enforcement officials and their municipal employers, claim that they are not civilly liable for Liebenstein's death and have filed motions for summary judgment.  In addition, defendant Ozaukee County has filed a motion for summary judgment as to its cross-claim for indemnification from defendant City of Port Washington.  For the following reasons, the Court grants the defendants' motions for summary judgment on the federal and pendent state claims, and grants the motion for summary judgment on the cross-claim.

## I.  FACTUAL BACKGROUND

### A.  NIGHT OF OCTOBER 15, 1989

Robert Liebenstein ("Liebenstein") lived with his parents at 527 West Jefferson in Port Washington, Ozaukee County, Wisconsin.  At the time of his death, Liebenstein

---

1.  Although the shooting occurred at approximately 1:35 a.m. on October 16, 1989, for the sake of convenience and clarity, the Court shall refer to the events as occurring on the evening or night of October 15, 1989.

was 37 years old and unmarried. Complaint at ¶ 5. Late in the evening of October 15, 1989, he became intoxicated and began firing a weapon from his front lawn, aiming at the family car, at a street light, and into the air. Complaint at ¶ 10. His behavior caused quite a disturbance in his neighborhood, and Mr. Albert Schoenfeldt, who lived across the street from the Liebensteins, telephoned the police department.

At approximately the same time, Liebenstein's cousin, Jim Erlwig, telephoned the police to inform them of his cousin's behavior. Liebenstein had called Erlwig earlier in the night and told him to come over to his house, or else he would start shooting. Liebenstein also warned Erlwig not to bring any police with him, or else they would be shot. Theisen Dep. at 28.[2] After receiving this call, Erlwig dialed the police emergency number and relayed this conversation to Bonnie Kelly, the police operator.[3] She immediately notified Donald Theisen ("Theisen"), a sergeant in the Port Washington Police Department, of the incident at West Jefferson.

This was not the first time Theisen had heard of Liebenstein. *Id.* at 29. Liebenstein was mentally and emotionally unstable and was known to become violent when he was drunk. He had been the subject of many complaints and investigations. He was verbally abusive and often threatened others by stating he would come after them with one of the many guns he owned. On occasion, he would frighten his parents so much that they were forced to flee from their home. His father was afraid of him when he was drunk. Bert Liebenstein Dep. at 97, 100. Once, Liebenstein told his aunt that he was prepared to go down to Florida, where his parents were vacationing, to "take care of them." Liebenstein was married briefly; shortly after the marriage, he attacked his wife and began to strangle her. She left him, but refused to press charges. Liebenstein had also expressed his hatred of police,

Theisen in particular, when he became embroiled in confrontational situations with them. Theisen was aware of these prior incidents; as sergeant, he read all the reports of the officers under his command.

Theisen was the commanding officer from Port Washington during the night of October 15. Theisen Dep. at 23. After receiving notice of Liebenstein's behavior, he equipped himself with his service revolver and his bulletproof vest, then travelled to the parking lot of St. Mary's Ozaukee Hospital. *Id.* at 24–26. Waiting there was Lieutenant James Knowles, the commander of Ozaukee County's Strategic Response, or SWAT, Team, along with other members of the SWAT team, including defendants Charles Crowe ("Crowe") and Rodney Galbraith ("Galbraith").[4] These men had been called out to help with the situation by Sergeant Maher of the Port Washington Police Department. Theisen arrived at the hospital at approximately 12:30 or 12:35. Theisen Dep. at 26.

Knowles sent Galbraith and Crowe, who were designated Observer Team 1, to the Schoenfeldts' house, across the street from Liebenstein's yard, to send reports back to the hospital. Galbraith and Crowe radioed in at approximately 12:40 or 12:50, stating that they were situated at the Schoenfeldts' house. Theisen Dep. at 59; Knowles Dep. at 4. About ten minutes later, or at approximately 1:00, Knowles sent another group as Observer Team 2 to attempt to gain access to Liebenstein's back yard. Theisen Dep. at 60; Knowles Dep. at 9.

The police attempted to establish both an outer perimeter and an inner perimeter. The outer perimeter would keep civilians from coming too close to Liebenstein's house; the inner perimeter was intended to keep Liebenstein within a limited area. Although people were effectively blocked from entering West Jefferson Street, neither Theisen nor Knowles ever received any notification

---

**2.** The defendant police officers learned about these threats later in the evening, before Liebenstein was shot.

**3.** Kelly also received calls from a number of Liebenstein's neighbors throughout the night,

who dialed the 911 number to report gunshots in their vicinity.

**4.** Galbraith and Crowe were employed by the Ozaukee County Sheriff's Department.

from Team 2 as to whether an inner perimeter had been established.

Liebenstein never left his property all night. He fired his gun from his front yard. Four or five times, he went inside the house. Before Liebenstein would go into the house, he would place his gun on the front porch, where other weapons were located.[5] Sometimes, he picked up the telephone receiver and spoke into it for one or two minutes. Galbraith Dep. at 88.[6] He would not hang up the phone; instead, he would set the receiver on the table when he was finished talking. Once, he stood near a window, looking down at something he was doing with his hands; it appeared as though he was loading a gun. Galbraith Dep. at 82. After speaking on the phone, he would emerge from the house, pick up a weapon, and commence firing.

Knowles and Theisen remained at the hospital and maintained radio contact with Crowe and Galbraith throughout the night. Neither Theisen nor Knowles was able to observe the events occurring on West Jefferson Street; they received all of their information about the developments of the night over the radio. Approximately five minutes before Liebenstein was shot, his shooting escalated. He aimed his gun in an eastward direction, roughly the location of the Schoenfeldt's house, and began to fire rapidly, walking toward the edge of his yard. Galbraith heard bullets going through the trees surrounding the house, and it appeared as if Liebenstein was firing directly at the Schoenfeldts' house. Galbraith Dep. at 94. Then Liebenstein turned around and walked back toward his house, firing his gun at the house as he was walking. *Id.* at 95. Once he reached his porch, he turned around and began walking away from his house again. Galbraith Dep. at 99. It appeared to Galbraith and Crowe that he might be leaving his property to go into the neighborhood.[7] They informed Knowles and Theisen of this. At this time, Knowles turned to Theisen and said that something had to be done to get the situation under control. Theisen Dep. at 72. Theisen concurred.[8] *Id.* at 73; Knowles Dep. at 23. Within fifteen to twenty seconds of receiving notice of the escalation of shooting, Knowles gave Crowe and Galbraith the "green light" to go ahead and "neutralize" the situation. Theisen Dep. at 74.[9] Immediately after the green light was given, Liebenstein fired two shots at a street light that was west of the house and hit the light with the second shot, putting it out and limiting Crowe's ability to see him. Crowe Dep. at 117.[10] Then Liebenstein turned around and headed back toward his front porch. He was carrying his rifle in the "port-arms" position, that is, across his chest with the barrel pointing upward at a 45–degree angle. As Liebenstein was sitting down on the front porch steps, with his body bent over, Crowe fired a single shot into Liebenstein's chest, killing him. Crowe Dep. at 118. Liebenstein was killed twenty or twenty-five seconds after the green light was given. Theisen Dep. at 80.[11]

There is some dispute over the direction from which the bullet was fired. The defendants all contend that Crowe fired the gun from the front door of the Schoenfeldts'

---

5. There were three rifles propped against the front stoop. Galbraith Dep. at 59.

6. When Crowe and Galbraith arrived at the Schoenfeldts' home, Liebenstein was on the phone. Galbraith estimates that Liebenstein was inside for two to five minutes, apparently unarmed, before he went back outside. Galbraith Dep. at 62.

7. One of the members of the SWAT team was standing one or two blocks down West Jefferson Street, and the defendant officers were concerned that Liebenstein would encounter him if he left his front yard. They also feared that Liebenstein might attack some of his neighbors in their homes.

8. Theisen knew at this time that Liebenstein would be shot. Theisen Dep. at 73.

9. These are the terms that were used by the officers in their depositions. The word "kill" was never used. Theisen Dep. at 74.

10. Crowe did not want to fire at Liebenstein then, although he could have, because if the shot missed, there was the possibility that the bullet would go into one of the neighbors' houses. Crowe Dep. at 117.

11. After the "green light" was given, Galbraith and Crowe had to go to the front door, hold the door open, and focus the gun on Liebenstein. This took less than thirty seconds. Galbraith Dep. at 78.

house while Galbraith held the door open. However, the plaintiffs have pointed out several inconsistencies in this version and claim that the bullet was actually fired from the storage room on the second floor of the house. First, Mr. Schoenfeldt has testified that he and his family were hiding in a room on the second floor when the actual killing took place, and they heard someone running down the second story hall and down the stairs immediately after the shot was fired. Later, he found a box of bullets in the storage room. When an investigation took place, measurements were taken from the second story. Finally, Mr. Schoenfeldt states that it would not have been necessary for Galbraith to hold the door open so Crowe could fire. There was an outer door and an inner door, both of which stayed ajar once they had been opened.

Throughout the night, Bonnie Kelly telephoned the Liebensteins' neighbors, advising them of the danger and warning them to go to their basements. Nevertheless, Theisen has stated that based upon his experience, he knew that many people would disregard this warning and watch Liebenstein from their windows.[12] He also knew that the bullets Liebenstein was using were powerful and could penetrate the walls of houses or the sides of cars. Galbraith and Crowe had asked the Schoenfeldt family to go to their basement for their safety, but instead the family chose to hide in a second-story bedroom. Crowe Dep. at 80; Galbraith Dep. at 108.

Throughout the course of the night, a negotiator was unsuccessfully attempting to reach the Liebenstein home by telephone. There was nothing but a busy signal, and an operator confirmed that the phone was either off the hook or out of order. If contact had been made, the negotiator would have tried to de-escalate the situation by talking with Liebenstein, and then would have asked him to surrender peacefully or to explain what was bothering him and ask him what the police could do to help. Knowles Dep. at 31.

Galbraith, Crowe, and the other members of the SWAT team near Liebenstein's home were concealed but were not covered. In other words, Liebenstein was not able to see where they were located, but the officers were not protected from his fire. Liebenstein was shooting a high-powered rifle which had bullets that could penetrate concrete blocks, according to Knowles, and hiding in a house with wooden walls or behind a car would not protect a person from this type of gunfire. Knowles Dep. at 77.

On the night of October 15, there were lights on inside the Liebenstein house. In contrast, the Schoenfeldt home was dark, with no lights on or only a single light on in the back of the house. Crowe Dep. at 105. In addition, the Schoenfeldt home was partially obscured by two large trees that flanked the front door. Crowe Dep. at 105.

**B.** *Guidelines for Use of Deadly Force*

Both the Port Washington Police Department and the Ozaukee County Sheriff's Department had guidelines in place for the use of deadly force on the date Liebenstein was killed. The Port Washington Police Department's guidelines, which became effective on January 23, 1987, provide that deadly force should never be used except "[a]s a last resort in defense of ones self [sic] or in the defense of another person whom one has reasonable cause to believe is in eminent [sic] danger of death or great bodily harm." Deadly force is authorized during an arrest when "all other reasonable means of apprehension and control have been exhausted" if "the officer has reasonable cause to believe" that the suspect "has committed or is attempting to commit a felony involving the use or threatened use of deadly force." If police are in a situation where deadly force is likely to be used, they should, "if possible, identify themselves, order the suspect to desist from the unlawful activity, and threaten to use bodily force if the lawful order is not obeyed."

The Ozaukee Sheriff's Department's policy and procedures for use of deadly force are

---

12. After Liebenstein was shot, the police discovered that there had been people standing in a driveway several houses down the street, and one of them had tried to get a closer look by moving to the bushes surrounding the house next door to the Schoenfeldts'.

similar. Deadly force is only authorized "[w]hen there is no reasonable alternative in the defense of one's self, and there is reasonable cause to believe that one is in imminent danger of death or great bodily harm." The policies cite to Wisconsin's statutory authority concerning deadly force, Section 939.48(1) Wis.Stats., which provides in part:

> [A person] may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm.

Finally, a police officer is advised "to make every reasonable effort" to:

> 1) identify himself *unless* his identity is obvious under the circumstances;
>
> 2) order the suspect to desist from the unlawful and life threatening activity;
>
> 3) threaten to use deadly force prior to its actual use if the order to desist is not obeyed.

## II.  *LEGAL FRAMEWORK*

### A.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) empowers a district court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If a court enters summary judgment, it must necessarily follow that no reasonable jury would have reached a verdict in favor of the non-moving party. *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985). In reaching this conclusion, the record must be viewed in the light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita Electronics Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A court need not draw every inference from the record, only reasonable inferences. *Spring v. Sheboygan Area School District,* 865 F.2d 883, 886 (7th Cir. 1989).

The initial burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden has been met, the non-moving party must "go beyond the pleadings" and designate specific facts to support or defend each element of the cause of action, showing there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. at 2552–53. Neither party may rest on mere allegations in the pleadings or conclusory statements in affidavits, and both must produce proper documentary evidence to support their contentions. *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983); *First Commodity Traders v. Heinold Commodities,* 766 F.2d 1007, 1011 (7th Cir.1985).

### B.  FOURTH AMENDMENT IMPLICATIONS OF EXCESSIVE FORCE

The Fourth Amendment provides persons with the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and this right extends to those persons suspected of actual or anticipated criminal wrongdoing. When police officers arrest a criminal suspect, they make a seizure, and their conduct is governed by the Fourth Amendment. Even when there is no full-scale arrest made, the Fourth Amendment will apply to the officers' conduct as long as the suspect's freedom to walk away is restrained. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

The Fourth Amendment and the case law emanating from it indicate that while there are important governmental interests in effective law enforcement, there are equally powerful countervailing interests supporting a person's right to be free of the intrusiveness which inevitably accompanies a seizure. The arresting officer must have probable cause to believe that the suspect committed, or was about to commit, a crime before he may effect a constitutional arrest. When the seizure does not rise to the level of a full-scale arrest, courts have determined the reasonableness of the seizure by balancing its

intrusiveness against "the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). Under certain circumstances, probable cause is not always required for a police officer to make a limited seizure of a person, as long as the seizure is justified by "special law-enforcement interests" and does not have "the essential attributes of a formal arrest." *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981).

"[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). When a police officer kills or mortally wounds a fleeing suspect in an attempt to make an arrest, a seizure of the ultimate magnitude occurs. Not only is the suspect deprived of his own life, in which he has an undeniable fundamental interest, society is deprived of "judicial determination of guilt and punishment." *Id.* at 9, 105 S.Ct. at 1700. Nevertheless, considerations of effective law enforcement demand that deadly force be permissible under certain circumstances.

In *Tennessee v. Garner,* the Supreme Court found that the use of deadly force in apprehending a criminal suspect was constitutionally reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11, 105 S.Ct. at 1701. Garner, a suspect in a burglary, was fleeing the scene of the crime when he was spotted by a police officer. When Garner refused to heed the officer's orders to stop, the officer fired his gun at Garner and mortally wounded him. Under a Tennessee statute, a police officer could effect an arrest by any necessary means if a suspect had been given notice of the officer's intent to arrest him and persisted in fleeing or forcibly resisting arrest. The Supreme Court found that this statute was unconstitu-

tional as it applied to Garner, since it would have justified the use of unreasonable force regardless of the danger presented by the suspect.

In *Garner,* the Court's language suggests the application of an objective standard when evaluating the arresting officer's conduct. *Id.* at 21, 105 S.Ct. at 1706.[13] However, the Court never affirmatively espoused a subjective or an objective analysis in the context of a police officer's use of deadly force until 1989, when it explicitly endorsed the traditional Fourth Amendment objective standard for excessive force cases in *Graham v. O'Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

In *Graham,* the defendant police officers had forcibly detained the plaintiff, who was a diabetic, and prevented him from drinking orange juice that was offered to him to offset his "sugar reaction." The district and appellate courts both required the plaintiff to show that the police officers had applied force "maliciously and sadistically for the very purpose of causing harm" in order to prevail on his § 1983 action. *Graham v. Connor,* 490 U.S. at 390, 109 S.Ct. at 1869, citing *Graham v. Connor,* 644 F.Supp. 246, 248 (W.D.N.C. 1986). The Supreme Court rejected this subjective standard, which had been widely used since 1973. *See Johnson v. Glick,* 481 F.2d 1028 (2nd Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Instead, it held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. at 395, 109 S.Ct. at 1872.

Since the use of deadly force is governed by a Fourth Amendment analysis, courts must employ the balancing test discussed earlier. The nature and quality of the intrusion must be balanced against the government's interests. *Id.* at 396, 109 S.Ct. at 1872. Among the factors to be considered are "the severity of the crime at issue,

---

**13.** "Officer Hymon could not *reasonably have believed* that Garner ... posed any threat." *Tennessee v. Garner,* 471 U.S. at 21, 105 S.Ct. at

1706. The use of the "reasonable belief" language seems to embrace an objective, rather than subjective, analysis.

whether the suspect poses an immediate threat to the safety of the officers or other, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, citing *Tennessee v. Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1699–1700. There is no bright-line test; instead, courts must consider the officers' conduct in light of the totality of circumstances. *Graham v. Connor,* 490 U.S. at 396–97, 109 S.Ct. at 1872.

The *Graham* court emphasized that the reasonableness of the police officers' behavior cannot be judged in retrospect; rather, courts must determine whether a reasonable police officer, confronted with the same facts and circumstances with the defendant officers, would have acted in the same manner as the defendant officers. Police officers are afforded some deference since they "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. at 1872. To judge their conduct with "the 20/20 vision of hindsight" would ignore the nature of these decisions.

### C. QUALIFIED IMMUNITY

Public officials, including police officers, may plead the affirmative defense of qualified immunity if they are defendants in an action under the Constitution or laws of the United States. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982). Courts have recognized society's competing interests in effective law enforcement and protecting the rights of individual citizens. The principle of qualified immunity provides public officials with a defense for many discretionary actions, so as not to discourage "the vigorous exercise of official authority." At the same time, it does not completely bar private citizens from seeking damages against these officers.

■ Qualified immunity will attach to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The law under which the actor is governed is the clearly established law that existed at the time of his conduct; a court may assume that a reasonable official would, or should, be aware of this law. *Bates v. Jean,* 745 F.2d 1146, 1152 (7th Cir.1984). Nevertheless, there may exist extraordinary circumstances under which an official may show that "he neither knew nor should have known of the relevant legal standard" governing his actions; in these cases, the defense of qualified immunity would be available. *Id.* 457 U.S. at 819, 102 S.Ct. at 2738. Unlike most legal defenses, qualified immunity shields a public official from a civil action altogether, instead of merely providing a defense that may be raised before a jury.

In essence, *Harlow v. Fitzgerald* set forth the governing standard for qualified immunity:

Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' *Pierson v. Ray,* 386 U.S. 547, 554 [87 S.Ct. 1213, 1218, 18 L.Ed.2d 288] (1967).

457 U.S. at 819, 102 S.Ct. at 2738.

■ Qualified immunity provides a valuable defense for police officers, because many of their daily discretionary decisions have the potential to affect individuals' civil liberties. Police will be immune from a legal action alleging excessive force if they behaved in an objectively reasonable manner. "The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [that his actions were] lawful, in light of clearly established law and the information the ... officer[ ] possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). The officer's subjective beliefs about

probable cause are irrelevant for the purposes of this inquiry. *Harlow,* 457 U.S. at 815–820, 102 S.Ct. at 2736–39.

In cases where the defense of qualified immunity is raised, the facts of the specific case are compared to the body of law existing at the time the cause of action arose. If the official conduct violated the Constitution or clearly established law at that time, then immunity will not attach and the official is open to liability. *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (*en banc*), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1989). If reasonable minds would differ as to whether the official's conduct was clearly illegal, then immunity should attach. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Once a public official has raised the defense of qualified immunity, the plaintiff bears the burden of establishing the existence of the clearly established right that he claims was violated. *Abel v. Miller,* 824 F.2d 1522, 1534 (7th Cir.1987). He must set forth facts or allegations which are sufficient to show that the defendant's conduct violated the law, citing to analogous cases which were decided before the violation occurred. *Powers v. Lightner,* 820 F.2d 818, 821 (7th Cir.1987). If the court concludes that the official violated the law, or if there are questions of fact upon which the issue of qualified immunity turn, then summary judgment is inappropriate and the case must proceed to trial. However, "[i]f the undisputed facts ... show that the defendant's conduct, as a matter of law, violated no clearly established legal norms, then the district court must grant the defendant qualified immunity." *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987).

## D. CLAIMS OF NEGLIGENCE UNDER STATE LAW

Although individual plaintiffs may assert claims against municipalities and their officials and employees in court, they are restricted by both common law and statutory principles based upon the notions of sovereign immunity. The standards for common law and statutory immunity mirror each other; statutory immunity protects municipalities from liability stemming from the acts of their officers and employees, while both statutory and common law immunity shield those officers and employees directly. Both provide immunity when the public officers or employees act discretionarily within their scope of duty.

### 1. Common Law Immunity

As a general rule, a public official acting in his official capacity is not liable to parties that have been injured as a result of some action that official has taken. *Lister v. Board of Regents,* 72 Wis.2d 282, 300, 240 N.W.2d 610 (1976). There is an exception to this general rule when the action arises from carrying out a purely ministerial duty. The Supreme Court of Wisconsin has defined a "ministerial" duty as being "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* at 301, 240 N.W.2d 610. When a state official carries out a discretionary function negligently, he will be immune from liability if he did not act with malice or wilful misconduct. "[T]here is no substantive liability for damages resulting from mistakes in judgment where the officer is specifically empowered to exercise such judgment." *Id.* at 301–02, 240 N.W.2d 610. The discretionary function must fall within his authority as a public officer, and he will receive no immunity from an action stemming from the exercise of a discretionary function wholly outside his scope of authority. *Maynard v. City of Madison,* 101 Wis.2d 273, 280, 304 N.W.2d 163 (1980).

### 2. Statutory Immunity

Section 893.80(4) Wis.Stats. bars suits against a governmental body for the acts of its officers or employees that have been done in the exercise of a legislative, quasi-legislative, judicial or quasi-judicial function. Wisconsin courts have concluded that the terms "legislative," "quasi-legislative," "judicial" and "quasi-judicial" are synonymous with "discretionary." *Scarpaci v. Milwaukee County,* 96 Wis.2d 663, 683, 292 N.W.2d 816, 826 (1980). A "quasi-judicial" act is one in

which a rule is applied to specific facts, necessitating the exercise of judgment and discretion on the part of the officer making the application.

## III. ANALYSIS

### A. FEDERAL LAW CLAIMS

■ It appears that the legal standards governing the Fourth Amendment and the defense of qualified immunity are the same. For each, the defendant's actions must be objectively reasonable. In addition, subjective thought processes are not relevant to a court's inquiry in either case. Nevertheless, the Fourth Amendment analysis goes to the very substance of the plaintiff's claims, whereas the qualified immunity analysis is a threshold issue that should be resolved before the case even reaches the summary judgment stage. *See, e.g. Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (qualified immunity creates "a right not to be tried"). If the Court were to grant the defendants' requests for qualified immunity, it would be making an implicit determination of the merits of the case as well.

Several federal appellate courts have remarked that a qualified immunity defense does not exist when the plaintiff's cause of action states a claim alleging excessive force. "Any qualified immunity 'defense' would be redundant, its substance having been incorporated into the cause of action itself." *Hunter v. District of Columbia,* 943 F.2d 69, 77 (D.C.Cir.1991) (dictum). Once a court finds that a reasonable police officer would not have believed that deadly force was appropriate, it has answered the qualified immunity question at the same time. *Dixon v. Richer,* 922 F.2d 1456, 1463 (10th Cir.1991). *See also Jackson v. Hoylman,* 933 F.2d 401, 402 (6th Cir.1991); Urbonya, *Problematic Standards of Reasonableness: Qualified Immunity in Section 1983 Actions for a Police Officer's Use of Excessive Force,* 62 Temple L.Rev. 61, 67 (1989) (because of the overlapping standards for excessive force and qualified immunity, qualified immunity is an unnecessary defense in an excessive force case). Therefore, these courts have found that this issue is best preserved for trial.

However, other courts have held that the defense of qualified immunity should be available to police officers for excessive force claims. The Fourth Circuit concluded that there was "no principled reason not to allow a defense of qualified immunity in an excessive use of force claim, when it is allowed in other actions alleging violations of the fourth amendment." *Slattery v. Rizzo,* 939 F.2d 213, 215 (1991). Other courts have made similar determinations in the wake of *Graham v. Connor. See, e.g., Finnegan v. Fountain,* 915 F.2d 817 (2d Cir.1990); *Brown v. Glossip,* 878 F.2d 871 (5th Cir.1989). The Seventh Circuit has not addressed this precise issue.

This Court adopts the reasoning of the latter line of cases and holds that qualified immunity is a valid defense even in excessive force cases. Qualified immunity is a product of a public policy which is intended to protect our law enforcement officials from the legal repercussions of hastily made decisions, as long as those decisions were made reasonably or did not violate a citizen's clearly established right. Our society does not want its police officers to worry about potential litigation; it wants them to concentrate on maintaining law and order in our cities and towns. Even when deadly force must be used in meeting these objectives, the same policy concerns hold true. Police officers are governed by laws and internal regulations limiting the use of deadly force, but may be permitted to act reasonably within these limitations without the fear of a lawsuit in the future. The limiting factor for discretionary conduct is not the degree of force used, but whether that force was objectively reasonable under the circumstances.

■ All Fourth Amendment claims, not just those addressing the use of excessive force, are subject to an objective "reasonableness" analysis. The fact that the reasonableness standard is used in both a Fourth Amendment analysis and a qualified immunity analysis should not be taken to mean that a qualified immunity defense is never available when a Fourth Amendment violation is alleged. The Fourth Amendment requires reasonable conduct on the part of police offi-

cers; qualified immunity gives the officer the benefit of the doubt when a civil action is undertaken. A police officer may not completely disregard the law when he uses deadly force, but he is protected from legal action as long as that use of force is reasonable. Qualified immunity encourages public officials to reasonably exercise their discretion and should extend to a police officer's use of deadly force. In this way, the officer can make a split second decision without having the fear of an impending civil action as long as the decision was reasonable. Although the legal burdens of proof may merge in a civil action alleging excessive force with a qualified immunity defense, the Court sees no reason to deprive public officials of a defense which would be otherwise available. Therefore, the individual defendants' qualified immunity defense shall be considered.

■ Since the defense of qualified immunity may be used in excessive force cases, it remains to be seen whether it may be used in this case. The defendants' actions must be governed by the law as it existed on October 16, 1988. *Garner* authorized the use of deadly force in apprehending a fleeing suspect if that suspect posed a risk to either the arresting officer or another person. Neither party has directed the Court to any case law or statute which confer on a suspect the right to be warned before the use of deadly force. One consideration mentioned by the Supreme Court in *Garner* was that a warning should be given, if feasible. *Garner*, 471 U.S. at 11–12, 105 S.Ct. at 1701. Similarly, the Court may infer that all of the individual defendants knew about *Garner*'s holding, especially since it is virtually identical to Port Washington and Ozaukee County's guidelines for the use of deadly force. *See Crowder v. Lash*, 687 F.2d 996, 1107 (7th Cir.1982) (reasonable public official expected to know law governing his conduct). Finally, although the Court must give the decisions of the police officers great deference, and not judge them with the benefit of hindsight, it is equally true that these decisions must be objectively reasonable.

The defendants have argued that Liebenstein posed a threat of serious bodily harm because he had the means to inflict this harm, had expressed an intent to commit harm, and was behaving in a dangerous manner. Galbraith and Crowe were concerned that Liebenstein would shoot at them if they disclosed their location. Whether they were inside or outside the Schoenfeldts' house, they were still in danger, as the bullets were capable of penetrating walls. In addition, Liebenstein had shot out a street light, which made it more difficult for Crowe to aim his rifle. The police did not know whether Liebenstein's parents were inside the house, and believed that they might have been taken hostage. Finally, although the house was surrounded, Theisen and Knowles did not know whether an inner perimeter had been established and were merely communicating with Team 1, Galbraith and Crowe. Although it had been twenty to thirty minutes since Team 2 had been sent out, there was no verbal confirmation that Team 2 had situated itself around the Liebensteins' back yard.

In response, the plaintiffs have pointed out that although Liebenstein had the means to kill, he never employed these means at all. Most of the time, he was firing up in the air or at his car. During the escalation, he was firing with his gun held horizontally, but he was not firing directly at anyone. Even though he may have pointed the weapon in the direction of Galbraith and Crowe, he did not know that they were there, and never aimed his gun in at them. Similarly, he was firing in the direction of the Schoenfeldts' house, but there is no evidence that he was aiming at the house itself. In the course of the night, Liebenstein carried on a conversation with an individual in front of his home, giving rise to the inference that Liebenstein was not in a homicidal rage.[14] Finally, he was not fleeing or attempting to evade arrest.

Both parties have presented persuasive arguments and have left this Court in a difficult position. While it is true that Robert Liebenstein was shot dead in his front yard without having been given a warning, it is also a fact that Liebenstein presented a danger to the police and to the community. The

---

14. Galbraith and Crowe witnessed the conversation.

law of qualified immunity holds that "if officers of reasonable competence could disagree on [an] issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Because the Court must apply this standard, it holds that qualified immunity should apply to all four individual defendants in this action.

The law at the time of the incident, as well as the policies for both law enforcement agencies, permitted the use of deadly force under certain circumstances. The officer using the force is required to determine whether such force is reasonable prior to exercising it. The use of the word "reasonable" implies a willingness to afford the police discretion so that split-second decisions can be made without the threat of legal repercussions as long this conduct conformed to the law at the time the force was exercised. In addition, the "feasibility" language of the departmental regulations and *Garner* implies that the police are required to make a judgment call. There may be some situations in which the use of deadly force is so improper that a court need not even address whether a less violent option was "feasible." But in this case, where it was not clear whether a warning would result in further violence and perhaps bloodshed, it is not apparent that a warning would have been feasible.

The defendants have submitted records of numerous criminal complaints about Liebenstein; this victim was no stranger to criminal investigations. He was known to be violent when he was intoxicated, as he was on the night of October 15. He had made threats to the police in the past, and he reiterated these threats on the phone to his cousin, stating his willingness to shoot or kill any officers that the cousin sent over to the house. Liebenstein was a good shot and was capable of killing or wounding an officer who was concealed in a neighboring house, since his guns and bullets were so powerful. Based upon these facts, the officers found that it was not feasible to warn Liebenstein before firing.

In addition, the police were concerned about Liebenstein's parents, who were believed to be inside the house. They feared that any aggressive contact on their part might result in harm to either Bert or Audrey Liebenstein. Therefore, no attempts were made to arrest Liebenstein while he was inside and apparently unarmed. If such an attempt were to fail, Liebenstein would be able to fire his weapon within seconds, either at the police or at his parents.

This interpretation of these facts cannot, in the Court's opinion, be called unreasonable. In retrospect, the idea of shooting a man in his front yard without giving him a choice of surrendering or fighting seems cold-blooded and militaristic. However, at the time, the neighborhood was either paralyzed with fear or overcome with a deadly curiosity. While Mrs. Schoenfeldt was cowering in the second floor storage room of her house, afraid to move to the safety of the basement, another neighbor attempted to sneak a closer look at all the activity and nearly walked into Liebenstein's front yard. It appeared to the police that Liebenstein intended to leave the area, at which time both police and neighbors would be in even greater danger.

■ Although the plaintiffs have offered expert testimony which raises a question of fact about the reasonableness of the defendants' conduct, this is not sufficient to defeat the defendants' immunity. Rather, the standard for qualified immunity calls for a situation in which *any* reasonable police officer would have known at the time that the use of deadly force was clearly unreasonable under the circumstances. The use of expert testimony is particularly ill-suited to defeat qualified immunity, especially when there is no clearly established law that the defendants violated. Although the experts might find that the defendants' actions were unreasonable, that does not mean that they violated a clearly established right. As long as this question remains extant, qualified immunity should attach.

The plaintiffs have attempted to raise a question of fact concerning the location from which Crowe fired the fatal shot. However, this issue is not germane to the question of qualified immunity. Regardless of whether Crowe fired from the first or second floor, and regardless of whether he and Galbraith are lying or telling the truth, the fact re-

mains that the shooting was not clearly illegal.

All four of the individual defendants are immune from suit in this proceeding. Theisen and Knowles were informed of the escalation and the fact that Liebenstein appeared to be leaving his front yard while firing a high-powered gun in a horizontal position. They knew that Liebenstein was intoxicated and that he tended to be violent when drunk. Concerned about the safety of other officers and Liebenstein's neighbors, the "green light" was given, because it was the only way to control Liebenstein without putting others in risk of their lives.

Similarly, Galbraith and Crowe are immune. An order had come through to neutralize the situation. Although Liebenstein was sitting down when he was shot, it was still possible for him to have fired the rifle from the position in which he was holding it. It was difficult for Crowe to aim, since the Schoenfeldt house was flanked by trees; in addition, Liebenstein had recently shot out a streetlight which had previously afforded Crowe some illumination. Had he or Galbraith issued a warning before firing, they arguably would have endangered both themselves and the entire Schoenfeldt family, who had not taken cover in the basement as ordered.

It is difficult to deny a family any avenue to relief in a case that is as close as this one is. However, the principles of qualified immunity demand such a result. Liebenstein was no harmless "innocent bystander" who was ruthlessly mowed down by a police sniper; he was a dangerous, violent man who had threatened to kill anyone who attempted to stop him on the night of October 15. The fact that no one was hurt can be attributed in great part to the late hour and the effectiveness of the police in blockading the area, not to Liebenstein's lack of intent. His bullets could easily penetrate the walls of neighborhood houses and kill people hiding inside. The law gives police discretion in cases such as this, where a bright-line rule is incapable of taking into account all the variables present. The defendants watched Liebenstein and evaluated the dangerousness of the situation and, in the end, did what they believed was the only reasonable thing to do. Because the Court agrees that other police, confronted with the same situation, would find that the force used by the defendants was reasonable, the defendants are shielded from this action under the principles of qualified immunity.

### B. STATE LAW CLAIMS

The plaintiffs have accused the municipal defendants of negligently training and supervising its officers, and claim that this negligence was the proximate cause of Liebenstein's death. They also contend that the municipal defendants are liable under a theory of *respondeat superior*, due to the liability of defendants Theisen, Knowles, Galbraith and Crowe.

In determining whether the municipal entities and employees are liable to the plaintiffs for the state law negligence claims, the Court must shift its focus from the reasonableness of the officers' actions to the nature of those actions. Specifically, the question is whether the actions were ministerial or discretionary.

Both municipal entities, Port Washington and Ozaukee County, had guidelines pertaining to law enforcement officials' use of deadly force. These guidelines sanction the use of deadly force if it is "the minimum force reasonable and necessary to effect a lawful purpose" or when there are no other reasonable alternatives available to effect an arrest or to defend oneself. The very definitions of these policies call for a certain degree of discretion on the part of the law enforcement officials; the police must determine what is "reasonable" under the circumstances.

The plaintiffs' arguments to the contrary do not convince the Court that these guidelines conferred a "ministerial" status upon the duties carried out by police officers. The Court finds that the individual defendants were given the discretion and judgment to work within certain parameters. In addition, the individual defendants were acting within the scope of their official duties when Liebenstein was surrounded and shot. The law enforcement officials were acting discretionarily and within the scope of their official duties on the night of October 15; whether

or not their conduct was reasonable is irrelevant to this inquiry.

■ As for the plaintiffs' claims against the municipal defendants based upon their "negligent failure to adequately train" the members of the Team, there is no evidence in the record which supports such a claim. In any case, the manner by which a police department chooses to train its officers is a discretionary function; therefore, the municipalities are statutorily immune from this claim.

Because the individual defendants were acting in a discretionary or quasi-judicial manner, the Court finds that all of the municipal defendants are immune from this action as a matter of law under Wisconsin common law and § 893.80(4) Wis.Stats. Therefore, the defendants' motions for summary judgment on these counts are granted, and the Court dismisses the pendent state claims contained in the complaint.

### C. CROSS-CLAIM [15]

■ Defendants Ozaukee County, Knowles, Galbraith and Crowe have made a cross-claim against the City of Port Washington and its insurer for indemnification from any liability incurred by them during the course of the night of October 15, 1989. Although the municipal defendants have been dismissed from this action, the cross-claim is still viable, since Wisconsin law requires indemnification for individual defendants' liability if that liability was incurred through the exercise of an official function. Section 895.46(1)(a) Wis.Stats. It does not matter, for the purposes of Section 895.46, whether the public official is being sued in his official capacity or as an individual; he must be indemnified in either case.

Defendants Knowles, Crowe and Galbraith were all employees of the Ozaukee County Sheriff's Department on the evening of October 15, 1989; they were called out as part of the Strategic Response Team. Ozaukee County claims that because the City of Port Washington requested help from the Team,

the responding officers were all de facto employees of Port Washington, rather than their own municipalities, throughout the night. It urges the Court to interpret § 895.46(1)(a) as requiring indemnification from the entity for whom the employee was working at the time the cause of action arose. According to its interpretation of the statute, Ozaukee County should not be liable for any of the three men's expenses, because they had been called out by Port Washington and had executed their duties in Port Washington.

Section 66.305(1) Wis.Stats. provides that "[u]pon the request of any law enforcement agency, . . . the law enforcement personnel of any other law enforcement agency may assist the requesting agency within the latter's jurisdiction . . . [S]uch law enforcement personnel while acting in response to such request, shall be deemed employees of the requesting agency." Section 66.30(2) Wis.Stats. allows municipalities to contract with each other for the purposes of furnishing services, to the extent that such contracts are valid under Wisconsin law. The City of Port Washington contends that these two statutes, read in conjunction with one another, support the conclusion that Ozaukee County agreed, by virtue of the MAC, to pay its own expenses arising out of the SWAT Team's conduct. Even though Port Washington was the requesting agency, the MAC contains the following provisions:

3. It is mutually agreed and understood that at all times while such responding law enforcement officers are within the requesting municipality, they shall continue to be employees of their employing municipality for all purposes including but not limited to wages, insurance, workmen's compensation and all other benefits as well as responsibility, and

4. It is mutually agreed and understood that none of the municipalities to this compact shall have any claim except sustenance against any other municipality to the compact arising out of the use of such enforcement personnel or their equipment.

15. Although the cross-claim might become moot due to the Court's decision to grant the defendants' motion for summary judgment, it shall be resolved here, since other disputes, such as actions for attorneys' fees, may be affected by it.

Port Washington claims that this language shifts the costs of the SWAT Team's maneuvers from Port Washington to Ozaukee County.

In response, Ozaukee County argues that this construction would violate the clear language of § 66.305, which states that the "law enforcement personnel ... *shall* be deemed employees of the requesting agency." (emphasis added). This language is mandatory, and the statute imposes the affirmative obligation upon Port Washington to treat every member of the SWAT Team as its employee for the purpose of litigation arising from the events of October 15, 1989.

The Court agrees with Ozaukee County. The language of § 66.305(1) is not inconsistent with § 66.30(2), which provides that municipalities may contract with one another "for the receipt or furnishing of services or the joint exercise of any power or duty required or authorized by law," subject to statutory restrictions. Seven Wisconsin law enforcement agencies entered into an agreement to send each other assistance in emergency situations. However, the clause in which the municipalities agree to pay their own costs is in conflict with § 66.30(2) Wis. Stats. insofar as indemnification is concerned. When a public official is sued, his employer must indemnify him. Section 895.46(1)(a) Wis.Stats. If he is part of a inter-municipal team, the requesting agency is his de facto employer for the purposes of indemnification. Section 66.305(1) Wis.Stats. Indemnification is a duty under § 66.30(2), but there are already Wisconsin statutes which address it in this context. Port Washington may not contract away its powers or duties when there is a statute specifically addressing this duty. Because Knowles, Galbraith and Crowe were all employees of Port Washington while they were participating in the SWAT Team's operations on the night of October 15, Port Washington must indemnify each of them. Defendant Ozaukee County's motion for summary judgment on the cross-claim is granted.

## IV. CONCLUSON

For the reasons set forth herein, the defendants' motion for summary judgment on the plaintiffs' Fourth Amendment excessive force claims is **GRANTED**. The defendants' motion for summary judgment on the plaintiffs' statutory and common law pendent negligence claims is **GRANTED**. Defendant Ozaukee County's motion for summary judgment on its cross-claim against defendant City of Port Washington is **GRANTED**.

**SO ORDERED.**