**Evangelina MARAVILLA, Individually and as Administratrix of the Estate of Melecio Maravilla; et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

No. 2:93–CV–129–RL.

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 17, 1994.

Ivan E. Bodensteiner, Valparaiso, IN, for plaintiffs.

Orest S. Szewciw, Asst. U.S. Atty., U.S. Attorney's Office, Dyer, IN, Terrance L. Smith, East Chicago, IN, for defendants.

### ORDER

LOZANO, District Judge.

This matter is before the Court on the following motions: Motion to Dismiss or in the Alternative for Summary Judgment filed by the United States on November 10, 1993; Motion to Dismiss or in the Alternative for Summary Judgment filed by Agents John Malone, Tim Wilson, and Kevin Cronin on November 10, 1993; Renewed Motion for Summary Judgment filed by the United States on June 23, 1994; Renewed Motion for Summary Judgment filed by Agents John Malone, Tim Wilson, Kevin Cronin, and Richard W. Marianos[1] on June 23, 1994; and Motion for Summary Judgment filed jointly by the City of East Chicago and Officers Michael Muskin, Feliciano[2] Rodriguez, John Nava, and Ralph Flores on July 12, 1994. For the reasons set forth below, the Motion to Dismiss or in the Alternative for Summary Judgment of the United States is **GRANTED IN PART** and **DENIED IN PART,** the Motion to Dismiss or in the Alternative for Summary Judgment of Malone, Wilson, and Cronin is **DENIED;** the Renewed Motions for Summary Judgment of the United States and Malone, Wilson, Cronin, and Marianos are **GRANTED,** and the Motion for Summary Judgment of the City of East Chicago and Muskin, Rodriguez, Nava, and Flores is **GRANTED.**

### BACKGROUND

Early on the morning of February 4, 1992, agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF" or "Bureau") and officers of the East Chicago, Indiana Police Department ("ECPD") went to the residence of the Maravilla family to execute a warrant for the arrest of Jesus Maravilla. During the course of that arrest, Melecio Maravilla, Sr. was shot and killed by ATF agents. Plaintiffs, who include the estate of Melecio Maravilla, Sr. and several members of the Maravilla family, then filed this law suit. Named as Defendants are the United States, four ATF agents, four ECPD officers, and the City of East Chicago. Plaintiffs seek to hold Defendants liable under the Federal Torts Claims Act ("FTCA"), the Fourth Amendment of the United States Constitution, 42 U.S.C. § 1983, and Indiana law.

In connection with their Renewed Motions for Summary Judgment and pursuant to Local Rule 56.1, the United States and the ATF agents filed a joint statement of the material facts in this case. The City of East Chicago

---

1. At the time Malone, Wilson, and Cronin filed their Motion to Dismiss or in the Alternative for Summary Judgment, Marianos was not a defendant; Marianos was later added as a defendant in Plaintiffs' Amended Complaint.

2. Officer Rodriguez was named as "Feliciano Rodriguez" in Plaintiffs' Amended Complaint, yet referred to both as "Feliciano" and "Frank" in briefs of the East Chicago Defendants.

and the ECPD officers also filed a joint statement of material facts. Those statements, which, as discussed below, are not effectively controverted by Plaintiffs, can be summarized as follows:

In May 1991, ATF agents began to investigate criminal offenses involving firearms and street gangs in Hammond and East Chicago, Indiana. On September 25, 1991, Jesus Maravilla participated in the sale of an illegal firearm. Based on this transaction, a probable cause warrant was sworn out and an arrest warrant was issued for Jesus Maravilla on January 31, 1992. Prior to the issuance of the warrant, ECPD officers informed ATF agents that Jesus' father, Melecio Maravilla, Sr., had threatened ECPD officers. ECPD officers also informed ATF agents that Melecio, Sr. had told ECPD officers they should know that if the ECPD took any action against him, he had more firepower than the ECPD did.

In late January 1992, ATF agents began to plan the execution of an arrest warrant on Jesus Maravilla. A ranking ATF agent, Michael Brostowitz, decided to use an entry control team ("ECT") to effect the arrest at Jesus' residence. An ECT is composed of ATF agents trained as a unit and used to ensure the safety of law enforcement personnel and members of the public during high-risk arrest, search, and undercover situations. In deciding to use the ECT, Agent Brostowitz relied on his observations of weapons purchases at the Maravilla residence, reports that Melecio Maravilla, Sr. disliked police, information that Jesus Maravilla had been armed when he sold weapons, and reports that Jesus Maravilla was a leader of a street gang, the East Chicago Latin Kings. Based on this information and his past experience, Agent Brostowitz believed it possible that Jesus and others at the Maravilla residence might resist the arrest of Jesus.

ATF Special Agent/Group Supervisor John Malone, who was an assistant team leader of the Chicago District Office ECT, also worked on planning the arrest. In doing so, Agent Malone considered the size of the Maravilla residence, the configuration of the doors leading into the house, the fact that Jesus had sold sawed-off shotguns, the fact that Melecio, Sr.'s handgun permit demonstrated that there might be firearms in the residence, Jesus' status as a gang member, and reports that Melecio Maravilla, Sr. was a "cop-hater."

Participants in the arrest were assigned roles at a briefing in the early morning of February 4, 1992. Participants were to include ATF agents who were members of the ECT, ATF agents who were not ECT members, and ECPD officers. The ECT was divided into three bunker teams, each composed of three to four agents. Two bunker teams were assigned to secure the first floor of the Maravilla residence and the third bunker team was assigned to secure the second floor. The second floor bunker team was composed of three of the four named ATF agents: Kevin Cronin, Timothy Wilson, and Richard Marianos. The fourth named ATF agent, John Malone, assigned himself to supervise and assist the second floor bunker team. No ECPD officer was a member of any bunker team.

The entry plan included using non-ECT ATF agents and ECPD officers to cover the perimeter of the Maravilla residence. The perimeter included the front and rear of the residence as well as the vacant lot south of the residence. The agents and officers assigned to perimeter security were to ensure that no one escaped from the south windows, prevent any nonofficers from entering the residence, and recover evidence that suspects might throw out the windows. Agents and officers assigned to perimeter security were directed to assume positions in the vacant lot south of the residence. Members of the second floor bunker team learned that agents and officers would be located in the vacant lot.

At approximately 6 a.m. on February 4, 1992, ATF agents and ECPD officers arrived at the Maravilla residence in East Chicago, Indiana. An ECT member knocked on the rear porch door and announced himself, stating, "Police with a warrant." Numerous ECT members then began to yell "police, police." After a few seconds, the first ECT member broke down the exterior door, enabling the bunker teams to enter the porch

area. The first two bunker teams entered the first floor of the house. The third bunker team, led by Agent Cronin, went to the second floor of the house. As the third bunker team went up the stairs, members of that team yelled "police, police."

At approximately the same time, ATF agents and ECPD officers who were in front of the house parked and exited their vehicles. ATF agents Thomas Ahern and Matthew Gorecki heard the ECT members yelling "police." These agents then took perimeter positions in front of the house and in the vacant lot to the south of the house. ECPD Lt. Michael Muskin and ECPD Sgt. Feliciano Rodriguez exited their vehicle in front of the Maravilla residence and heard the ECT entering the house and announcing "police." ECPD Officer Hector Rivera parked and exited his vehicle in the rear of the residence and moved into position in the vacant lot to the south of the house, at the western edge of that lot. Officer Rivera heard the ATF agents yelling as they entered the residence.

When they arrived at the top of the stairs, the third bunker team encountered a closed door leading into the second floor of the house. Agent Cronin then announced himself, stating, "Police officers with a warrant, open the door." After receiving no response, he forced open the door and entered the second floor. The third bunker team proceeded across the second floor in the following order: Cronin, Wilson, Marianos, and then Malone. The first room they entered was a kitchen. As they proceeded through the kitchen toward the front of the second floor, all members of the team continued to yell "police, police." As they approached the doorway leading from the kitchen into the front room of the second floor, a bedroom, members of the team heard gunshots.

Upon reaching the doorway and looking into the bedroom, Agents Cronin, Wilson, and Marianos saw Melecio Maravilla, Sr. kneeling on a bed and firing a gun through a window that looked out onto the vacant lot south of the Maravilla residence. Agents Cronin, Wilson, and Marianos saw muzzle flashes coming from the gun. Wilson was able to discern that Maravilla was pointing the gun downward. All three agents who saw Maravilla say they concluded that he was firing at the agents and officers performing perimeter security outside the residence. Malone, the fourth ATF agent to enter the second floor, heard gunshots from the bedroom but was not able to see into the bedroom. Several ATF agents and ECPD officers then positioned outside the residence— Agent Ahern, Agent Gorecki, ECPD Lt. Muskin, ECPD Sgt. Rodriguez, and ECPD Officer Rivera—saw and heard Maravilla firing out the window.

On the second floor, Maravilla did not respond when Agent Cronin yelled at him, "Police, drop it." When Maravilla continued firing out the window, Agent Cronin fired once at Maravilla and Wilson fired several times at Maravilla. Shots from the agents struck Maravilla and he fell to the floor. Cronin and Wilson state that they fired at Maravilla because they believed he was threatening the agents and officers outside the residence and also themselves.

Shortly thereafter, Cronin, Wilson and other ECT members entered the bedroom. Marianos saw Melecio Maravilla, Sr. lying on the floor next to the bed, saw a weapon lying on the floor next to him, and then moved the weapon away from Maravilla. The agents then summoned an ATF agent trained as an emergency medical technician. Maravilla was treated and taken to a local hospital. Maravilla died from the shooting.

The United States and the ATF agents have each moved for dismissal or, in the alternative, for summary judgment. Based on a stipulated order, Plaintiffs were directed to respond to four of the contentions raised in those motions, which, as circumscribed by the stipulated order, are pending before this Court. The United States and the ATF agents also have renewed motions for summary judgment pending before the Court, and the ECPD officers and the City of East Chicago have motions for summary judgment pending.

## DISCUSSION

The pleadings submitted in this case advance and debate a variety of legal grounds of recovery based on a variety of alleged wrongful conduct by a variety of parties.

Still, it can fairly be said that the essence of the suit is this: Plaintiffs allege that while executing an arrest warrant for Jesus Maravilla at the Maravilla residence, the named ATF agents and ECPD officers violated the Fourth Amendment and Indiana Law by using excessive force in entering the residence, in shooting and killing Melecio Maravilla, Sr., and in detaining other members of the Maravilla family. As such, this ruling will be largely governed by Fourth Amendment and Indiana law of excessive force, making a summary of the major principles of that law instructive at this point.

A claim that officers violated the Fourth Amendment by using excessive force during an arrest or other seizure must be analyzed under a standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Use of deadly force is objectively reasonable "where the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985); *see Plakas v. Drinski*, 19 F.3d 1143, 1146 (7th Cir.1994) (citing *Garner*). In determining the reasonableness of the officer's conduct, the focus is on the very moment when the officer makes the "split-second judgement[ ]" that leads to the use of deadly force. *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1871–72; *Plakas*, 19 F.3d at 1149. Furthermore, "pre-seizure conduct is not subject to Fourth Amendment scrutiny." *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir.1992). Even if officers follow a questionable scheme in bringing about an arrest, "the arrest itself and not the scheme" is what is subject to Fourth Amendment standards. *Id.* at 1333; *Plakas*, 19 F.3d at 1148–49 (citing *Carter*).

Under Indiana Law, a police officer may use deadly force if the officer reasonably believes force is necessary to "prevent serious bodily injury to the officer or a third person." Ind.Code Ann. § 35–41–3–3(b)(1)(B) (West Supp.1994). Reasonable force applied incident to lawful arrest is privileged in Indiana. *Meyer v. Robinson*, 992 F.2d 734, 738 (7th Cir.1993) (quoting *City of South Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind.Ct.App.1979)). An officer's nonprivileged use of force constitutes a battery. *See id.* Indiana places the burden on plaintiffs to overcome a presumption that police officers who use force do so reasonably and in good faith. *City of Indianapolis v. Ervin*, 405 N.E.2d 55, 59–60 (Ind.Ct.App.1980).

*Motions to Dismiss*

When deciding a motion to dismiss, this Court must assume the truth of a plaintiff's well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir.1994); *Jenkins v. Heintz*, 25 F.3d 536, 537 (7th Cir.1994). This Court may not dismiss a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Black v. Lane*, 22 F.3d 1395, 1403 (7th Cir. 1994). In order to prevail, the defendant must demonstrate that "the plaintiff's claim, as set forth by the complaint, is without legal consequence." *Veal v. First American Savings Bank*, 914 F.2d 909, 913 (7th Cir.1990).

1. ATF agents' motion

In seeking dismissal, the ATF agents argue that Plaintiffs have not sufficiently pleaded that the agents personally participated in detaining the members of the Maravilla family other than Melecio, Sr. The ATF agents also argue that the Plaintiffs have failed to state a claim for battery under Indiana law. However, Plaintiffs did allege in their Amended Complaint that ATF agents entered the Maravilla residence and that "there was no reason to strike and detain members of the Maravilla family." Amended Complaint at ¶ 18. While the Plaintiffs might have chosen clearer language, these allegations put the Defendants on notice of a claim that one or more of the ATF agents made wrongful physical contact with, or wrongfully detained, members of the Maravilla family. These statements thus satisfy the liberal federal notice pleading requirements. *See Hrubec v. Nat'l R.R. Pas-*

senger Corp., 981 F.2d 962, 963–64 (7th Cir. 1992) (noting that "a complaint may not be dismissed unless no relief may be granted 'under any set of facts that could be proved consistent with the allegations'") (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)). The agents' motion on these points is denied.

The ATF agents also argue that Plaintiffs have failed to state a claim for any violation of the Fourth Amendment. Here again, Plaintiffs have pleaded facts sufficient to support, at the pleading stage, claims founded upon the initial forceful entry into the Maravilla residence, the treatment of the members of the Maravilla family other than Melecio, Sr., and the shooting of Melecio, Sr. See id. Accordingly, the agents' motion is denied.

■ In addition to those dismissal grounds the stipulated order directed the parties to address, the ATF agents and Plaintiffs have also addressed whether the 1983 claims against the ATF agents should be dismissed because the Plaintiffs failed to plead state action by the ATF agents. A section 1983 claim, of course, must be based on conduct taken under color of state law. See 42 U.S.C. § 1983.

The Amended Complaint does allege that ATF agents and ECPD officers worked together to plan the execution of the warrant for the arrest of Jesus, which was a state warrant, and that both ATF agents and ECPD officers participated in the initial entry into the Maravilla residence. Thus, the face of the Amended Complaint here alleges facts that could support a claim that the ATF agents, although federal agents, were acting under color of state law in executing the warrant. Therefore, the ATF agents' motion to dismiss the 1983 claims against them for failure to plead state action is denied.

### 2. United States' motion

The United States argues that this Court lacks subject matter jurisdiction over any FTCA claims against it other than the specific claim based on the death of Melecio, Sr. The United States stresses that in a claim form presented to the Bureau of Alcohol, Tobacco & Firearms, the Maravilla family members only presented the claim for Melecio, Sr.'s death and not their own individual claims. According to the United States, this omission failed to satisfy FTCA requirements, resulting in lack of subject matter jurisdiction for this Court over the individual claims of family members against the United States.

■ The FTCA, waives the sovereign immunity of the United States. Erxleben v. United States, 668 F.2d 268, 270 (7th Cir. 1981). Before bringing a claim in a district court under the FTCA, the claimant must present notice of the claim to the appropriate federal agency. Id.; Adams by Adams v. United States Dept. of Housing & Urban Development, 807 F.2d 318, 319–20 (2d Cir. 1986). A district court has no subject matter jurisdiction over a claim not so presented. Erxleben, 668 F.2d at 270–71; Adams by Adams, 807 F.2d at 319–20. In this respect, the FTCA acts as a jurisdictional statute. See Erxleben, 668 F.2d at 270–71; Misany v. United States, 826 F.2d 612, 614 (7th Cir. 1987). The presentment requirement is meant to allow federal agencies adequate opportunity to settle claims before they become lawsuits in the district courts. Erxleben, 668 F.2d at 273 n. 9.

■ The claim form submitted by the Plaintiffs to the Bureau mentioned only a single claim: the wrongful death of Melecio Maravilla, Sr. Exh. 1 of United States' Mot. to Dismiss filed 11/10/93. Nowhere in the claim form did Plaintiffs indicate that other members of the Maravilla family might have claims based on their own separate injuries. See id.

Addressing this omission, Plaintiffs argue that "what this case is really all about" is the amount of damages claimed, i.e., the ultimate amount for which the United States might be liable. Thus, according to Plaintiffs, their notifying the Bureau of an amount of damages claimed was sufficient to put the Bureau on notice of the claims other than the alleged wrongful death of Melecio, Sr.

Plaintiffs repeat almost exactly an argument rejected by the Second Circuit. In Adams by Adams, 807 F.2d at 319, a girl was

struck by a falling kitchen cabinet in an apartment owned by the Department of Housing & Urban Development ("HUD"). An attorney wrote a letter to HUD submitting the girl's claim for her resultant injuries. *Id.* Later, the girl's mother sued HUD in district court, seeking damages for injuries to both the girl and to herself. *Id.* The district court dismissed the mother's claim for lack of subject matter jurisdiction, ruling that the mother had not properly presented her claim to HUD before bringing it in federal court. *Id.*

On appeal, the mother argued that she should have been deemed to have presented her claim to HUD within the meaning of FTCA because HUD should have known of her close relationship with her daughter, whose claim was presented to HUD. In effect, the mother sought to have "her name ... read into the administrative claim filed on behalf of her daughter." *Adams by Adams,* 807 F.2d at 320. In the opinion of the Second Circuit, the mother's claim bordered on the frivolous. *Id.* Accordingly, the Second Circuit upheld the district court's dismissal of the mother's claim. *Id.*

The members of the Maravilla family present essentially the same argument here. They would have this Court read into the single claim regarding Melecio, Sr.'s death the personal claims of other family members. The Court concludes that the family members failed to adequately present their claims to the Bureau; consequently, the Court has no subject matter jurisdiction to entertain those claims. Therefore, the only claim against the United States over which this Court possesses subject matter jurisdiction is the alleged wrongful death of Melecio Maravilla, Sr.

*Motions for Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *First Wis. Trust Co. v. Schroud,* 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Richardson v. Penfold,* 839 F.2d 392, 394 (7th Cir.1988).

The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might effect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo,* 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be " 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case neces-

sarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

Pursuant to Local Rule 56.1, Plaintiffs filed a statement of genuine issues of material fact in response to the Defendants' motions and statements of material fact. Several of the points Plaintiffs seek to make are facially inconsequential; these are discussed immediately below. Plaintiffs' relatively more noteworthy points are discussed at length later in this order.

Plaintiffs dispute whether Defendants had reason to believe that Jesus Maravilla was dangerous. Citing Jesus' somewhat vague deposition testimony, Plaintiffs assert that it is unresolved whether Jesus participated in the sale of an illegal firearm prior to his arrest at the Maravilla residence. Yet Plaintiffs have admitted elsewhere that Jesus was charged with dealing in a sawed-off shotgun and have conceded that prior to the arrest here, Jesus pleaded guilty to a misdemeanor offense involving his illegal possession of a shotgun that did not belong to him. Memo. Opp.EC Mot. for S.J. at 2; Answer to Req. to Admit No. 9. Plaintiffs also cite Jesus' own deposition testimony in which he claimed he had never been a member of a street gang. (Tr. 29–30) In the face of the numerous instances and reports to the contrary regarding Jesus' past criminal activity and reputed gang membership, (*see, e.g.*, Answer to Req. to Admit No. 9; Plaintiffs' S.J.Exh. 1; Brostowitz Dep. at 16–17; Malone Decl. at 2), Plaintiffs offer nothing more concrete than this self-serving statement.

In any event, Plaintiffs do not directly or otherwise challenge that the officers and agents went to the Maravilla residence to arrest Jesus pursuant to a valid warrant that was based on an alleged firearms violation. Moreover, Plaintiffs have admitted that agents found four firearms in the room where Jesus was arrested. Answer to Req. to Admit No. 11. The Court concludes that whether or not the Defendants reasonably believed Jesus dangerous is not genuinely controverted.

Based on alleged inconsistencies in deposition testimony, Plaintiffs also contend it is in dispute whether or not Melecio, Sr. was pointing his gun downwards as he was firing out the bedroom window. Yet whether disputed or not, this fact is not material. As discussed at length later, Melecio's firing the gun out a window while agents and officers were on the ground below gave the agents on the second floor reason to fear for their safety and the safety of those on the ground, regardless of the exact angle at which the gun was pointed.

Plaintiffs also urge that issues of material fact exist as to whether Muskin and Rodriguez had reason to seek cover and also state that ECPD officers pulled their weapons and that ECPD Officer Nava testified that he was at the Maravilla house on the day of the shooting at a time after the shooting. However, Plaintiffs do not elaborate on why these facts are material or why they are in dispute. Because neither the materiality nor the controversy is apparent to the Court, the Court will not address them further.

Ultimately, what is more telling than what Plaintiffs dispute is what they do not dispute. Nowhere have plaintiffs challenged the fact that Melecio, Sr. was kneeling on the bed and firing out the bedroom window when the ATF agents encountered him. As indicated above and discussed in greater detail below, this particular instant was the most crucial regarding the claim that the agents used excessive force against Melecio, Sr. In effect then, Plaintiffs have all but conceded that the seconds immediately surrounding the shooting of Melecio, Sr. unfolded precisely as the agents who were on the second floor have described them.

The Court now turns to Plaintiffs' relatively more significant arguments. Initially, it is noted that read most generously, Plaintiffs' Amended Complaint and arguments can be seen as charging all Defendants with liability for all the following discrete acts: planning the arrest, forcefully entering the Maravilla home, striking and detaining the members of the Maravilla family other than Melecio, Sr., and shooting Melecio, Sr. The Court reaches the following conclusions regarding each of these claims as raised against each of the Defendants.

## 1374

### 1. Shooting of Melecio, Sr.

█ Plaintiffs charge the ATF agents with liability under the Fourth Amendment, via both *Bivens*[3] and section 1983, for using excessive force in shooting Melecio, Sr. The ATF agents have moved for summary judgment on this claim.

On their face, the undisputed facts immediately surrounding the shooting of Melecio, Sr. depict a scenario in which the ATF agents were justified in using deadly force: The agents were executing a warrant in a home that they believed harbored firearms and at least two potentially violent individuals. While traversing the second floor, the agents heard gunfire coming from the next room. Upon reaching the door of that room, the agents saw Melecio, Sr. shooting a gun out the window. At that moment, other agents and officers were stationed on the ground outside. The agents then shot Melecio, Sr. This much of the story is utterly uncontroverted.

In addition to the more minor issues addressed above, Plaintiffs seek to introduce issues of material fact into this scenario based on three predominant contentions: First, that the agents on the second floor might not have had reason to fear for their own safety or the safety of others on the ground such that shooting Melecio, Sr. was justified. Second, that poor judgment and planning, such as improperly relying on Melecio's reputation as a dangerous "cop-hater," made the agents "trigger happy" and thereby facilitated a situation at the Maravilla residence that escalated into gunfire. Third, that the agents did not identify themselves as law enforcement officers upon entering and proceeding through the Maravilla residence, which, in turn, might support the inference that the agents did not warn Melecio, Sr. before they shot him.

Regarding the first contention, Plaintiffs acknowledge that the agents had two possible justifications for shooting Melecio, Sr.: to protect themselves should Melecio turn and fire upon them and to protect the officers and agents stationed on the ground. Plaintiffs argue that genuine issues exist as to whether either justification was truly present.

By citing to minor conflicts in deposition testimony of ATF agents, Plaintiffs have barely established an issue over whether the agents who shot Melecio, Sr. did so to protect themselves. Indeed, not all four agents who were on the second floor have cited fear for themselves as a reason why two of them fired at Melecio, Sr. Still, neither of the two agents who fired has affirmatively said that was not the reason. *See* Wilson Dep.; Cronin Dep. The only agent who might be said to have called into question self-defense as a reason for firing did not himself fire and appears to have been in some part addressing ATF policy. Malone Dep. at 45–46. All told, Plaintiffs have raised a minor doubt as to whether the agents fired in fear of their own safety.

█ However, whether the agents subjectively feared for their safety is not material. In assessing force reasonableness, the inquiry is whether the officers' actions were *objectively* reasonable "without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *see also McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir.1992); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir.1993) (an officer's "subjective intent as to the lawfulness of" his or her use of force is "irrelevant" in an excessive force case); *Liebenstein v. Crowe*, 826 F.Supp. 1174, 1184 (E.D.Wis.1992) ("subjective thought processes are not relevant to the court's inquiry" in a Fourth Amendment excessive force case). Even had the individual agents in this case not feared for themselves, the scenario just described would have fully justified a reasonable officer in having such fear. *See Plakas*, 19 F.3d at 1144–48 (ruling that an officer's use of deadly force to defend himself was reasonable where the handcuffed plaintiff had swung a fireplace poker at the officer). Because the agents here may have been unusually brave does not mean that

---

**3.** In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized a cause of action for damages against federal agents for violating the Fourth Amendment.

they were not endangered in an objective sense.

Plaintiffs also assert that an issue exists as to whether the agents who shot Melecio, Sr. had reason to fear for the safety of the officers and agents on the ground. They urge that the officers and agents outside the Maravilla residence were specifically assigned to cover areas not including the lot to the south of the house—the lot into which Melecio, Sr. was firing from the bedroom window. Consequently, Plaintiffs contend, the agents on the second floor had no reason to believe that the officers and agents assigned to cover the ground were threatened by Melecio Sr.'s shooting.

At the outset, Plaintiffs argument is belied by the very deposition they rely on. In that deposition, Agent Gorecki stated he was assigned to "provide security for the front [east] left corner of the house." (Tr. 9) Gorecki's actions were consistent with this: He said in his deposition that upon arriving at the Maravilla residence, he proceeded from his car westward along a line running parallel to but a foot or two away from the south edge of the house, toward the southeast corner of the house. (Tr. 16–17) He then heard shots from the south bedroom window and took cover at the front of the house. (Tr. 18–19) These instructions and actions put Gorecki in an area adjacent to, if not directly within, the zone of danger created by Melecio Sr.'s shooting out the south bedroom window.

In any event, whether or not agents and officers had been *precisely* instructed to station themselves in the south lot is not material. Regardless of the presence or lack of any such instructions, the agents who encountered Melecio, Sr. had ample reason to conclude that he threatened those assigned to cover the general area of the outside of the house. The agents could have quite reasonably concluded that whether the raid plan specifically called for it or not, their colleagues had ventured into the line of fire from the bedroom during the course of the raid, every action of which naturally could not be predicted or executed with complete precision. The standard of objective reasonableness that governs use of force under the Fourth Amendment did not require the agents to opt for withholding their fire based on the unlikely possibility that Melecio, Sr.— who was firing a gun from a window during a police raid at 6 a.m.—was not firing at the officers on the ground, but rather at something else. *See Ford v. Childers,* 855 F.2d 1271, 1275 (7th Cir.1988) (en banc) (stating in a 1983 action based on a police shooting that "a reasonable belief that danger exists may be formed by reliance on appearances"); *Plakas,* 19 F.3d at 1147 (noting in affirming summary judgment for an officer who used deadly force in self-defense that the plaintiff's concocting minor discrepancies was "not enough to allow a rational trier of fact to decide against" the officer). The speed with which the agents had to react to the situation before them further supports the reasonableness of their reaction. *See Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1871–72 (emphasizing that officers often have to decide to use force instantaneously and while under intense pressure); *Plakas,* 19 F.3d at 1149 (same).

Plaintiffs argue also that the agents and officers were without good reason to characterize Melecio, Sr. as a "cop-hater" and plan the arrest of Jesus with that in mind. In seeking to call the accuracy of Melecio, Sr.'s reputation into controversy, Plaintiffs focus on the deposition testimony of ECPD Officer Flores—yet they quote him out of context. Plaintiffs point to Flores describing a time when he was acquainted with Melecio, Sr. and had no reason to consider him a threat to police officers. (*See* Tr. 10) What Plaintiffs neglect to note is Flores' additional testimony regarding a conversation he had with Melecio, Sr. after this period of initial, uneventful acquaintance. Flores reported that when the two encountered each other in a tavern, Melecio, Sr. told Flores that he was tired of the police bothering his family and suggested that he had "better guns" than the police. (Tr. 19) Flores also stated in his deposition that he later reported this conversation to the Chief of the ECPD and to Defendant ECPD Officer Michael Muskin. (Tr. 23–24) Thus, despite Plaintiffs' contention to the contrary, it is established that Flores had reason to believe and did

believe that Melecio, Sr. might pose a danger to police officers.

Further attempting to challenge the perception of Melecio, Sr. as dangerous to police, Plaintiffs also cite the deposition testimony of ECPD Officer Rivera, in which he states that although he was acquainted with Melecio, Sr. before the raid, he had no reason to believe that Melecio, Sr. was dangerous or a "cop hater." (Tr. 19–21) Yet by itself, this naked statement proves nothing other than that one ECPD Officer's experience did not give him reason to consider Melecio, Sr. dangerous; it does not undermine Flores's contrary experience and report of that experience to other ECPD officers.

Moreover, whether the agents and officers rightfully considered Melecio, Sr. dangerous is immaterial because of what the agents in fact encountered. By firing out the bedroom window, Melecio, Sr. proved himself to be an immediate and serious danger to the agents and officers conducting the raid. Because preseizure conduct is not subject to Fourth Amendment scrutiny, *Carter v. Buscher,* 973 F.2d 1328, 1332 (7th Cir.1992) (rejecting the suggestion that "the Fourth Amendment prohibits creating unreasonably dangerous circumstances in which to effect a legal arrest of a suspect"); *Plakas,* 19 F.3d at 1148–49; *Cole,* 993 F.2d at 1333 (citing *Carter* ), and because reasonableness in excessive force cases is determined by reference to the situation as it appears to the officer at the very second that the officer decides to use force, *Ford,* 855 F.2d at 1275, any dispute over whether the agents had a wrong impression of Melecio, Sr. before the raid is not material to the propriety of the agents' response to what they found Melecio, Sr. doing during the raid.

 As the basis for their final contention, Plaintiffs suggest that none of the members of the three ECT's who entered the Maravilla residence ever identified themselves as police. The agents maintain exactly the opposite.

Adriana Maravilla stated affirmatively in her deposition that the agents *she encountered on the first floor* did not announce themselves as police. She also said that she simultaneously heard both gunshots and

voices coming from the second floor, that she could not tell what the voices were saying, but that she did not recognize any of the voices as her father's. (Tr. 26–28)

Marisela Maravilla stated in her deposition that she was half asleep and listening to her mother and sister talking when the raid began. She reports that she did not hear any announcement of "police" before hearing doors being forced in, and that once inside, agents told her to "get down." A few moments later she heard a series of gunshots but could not tell where they came from. About ten seconds passed, and then she heard a second series of gunshots. She claims not to have heard any voices from the second floor during the time period between the two series of gunshots. (Tr. 24, 34–35)

Evangelina Maravilla reported in her deposition that she heard nothing before the doors were forced in, and that upon entering, the agents ran past her to her sons' rooms without saying anything. (Tr. 16). Jesus Maravilla said in his deposition that on the morning of the raid, the first thing he heard was the door being forced in and glass breaking, but that he did not hear voices. (Tr. 40) In the excerpts of his deposition submitted to the Court, Melecio, Jr. doesn't speak at all to whether the agents announced themselves.

Plaintiffs have effectively conceded that no one other than the named ATF agents and Melecio, Sr. was on the second floor when Melecio, Sr. was shot. Answer to Req. to Admit Nos. 1–2. Thus, Plaintiffs were not able to see what happened on the second floor. According to their deposition testimony, Plaintiffs might have been able to hear some of what occurred on the second floor, but they were not in a position to conclusively determine what was or was not said by the agents or Melecio, Sr. Indeed, the only individuals who might be able to speak authoritatively on that are the ATF agents who were on the second floor.

As for those agents and the other agents and officers on the scene, they uniformly report that the ECT members announced themselves as police upon arriving at the back door, that only after receiving no response did the ECT members force open the

door, and that the ECT members continued to announce "police" while proceeding through the house. *See* Federal Def. Joint Statement of Mat. Fact. In particular, the members of the second floor bunker team report that they repeatedly announced "police" before entering the second floor and while proceeding through it, and that Cronin called, "Police, drop it" to Melecio, Sr. before shooting him. *See id.* at ¶¶ 12, 13, 15.

Though they have not clearly featured this in their argument, the import that Plaintiffs seem to attach to all this is that if the agents did not announce themselves, they acted unreasonably in entering and proceeding through the residence. Another possible inference that lack of announcement might support—though once again Plaintiffs have not themselves pointedly argued it—is that the agents who shot Melecio, Sr., did so without a warning and thereby acted unreasonably.

The conflicting reports of Plaintiffs and Defendants on this point resembles conflicting testimony in *Ford, supra,* and *Klein v. Ryan,* 847 F.2d 368 (7th Cir.1988). In *Ford,* two police officers answered a call that a holdup was in progress at a bank. 855 F.2d at 1272. When the officers arrived, one of them positioned himself next to the window of the bank and looked inside. *Id.* He saw several persons standing with their arms raised and an individual wearing a mask and extending his arm. *Id.* Because his view was blocked, the officer could not tell whether the masked individual had a gun. *Id.* Both officers then took up a position behind a car in the bank parking lot. *Id.* After several moments, the masked individual ran out the door of the bank carrying a bag. *Id.* One officer later testified that at that moment he twice called, "Halt, Police" to the masked individual before he and the other officer shot at the masked individual. *Id.* The masked individual, who was hit and eventually sued one officer under section 1983, later testified that he never heard the warnings. *Id.*

The district court directed a verdict for the officer. *Ford v. Childers,* 650 F.Supp. 110, 111 (C.D.Ill.1986). In ruling on a post-trial motion, the district court found that "even assuming *arguendo*" that the circumstances required a warning, the plaintiff's uncorroborated testimony was "self-serving" and thus not sufficient to rebut the officer's testimony. *Ford,* 650 F.Supp. at 113. The district court reaffirmed its directed verdict, based in part on its determination that no genuine dispute existed as to whether the officer gave the warnings. *Id.* at 113–14. On review, the Seventh Circuit affirmed. *Ford,* 855 F.2d at 1277.[4] In addressing the Plaintiff's testimony, the Court stated the following:

> Our review of the record further confirms that Officer Childers warned [the plaintiff] on two separate occasions before the officers fired. Officer Childers testified that he provided the warnings, calling "Halt, Police" twice before firing his service revolver. Considering that (1) the evidence established that at the time [the plaintiff] was wearing both a mask and a hood, which could very well have muffled the plaintiff's opportunity to hear the warnings, and (2) the plaintiff did not testify that warnings were not given but only that he did not hear any warnings, [the plaintiff's] testimony fails to contradict the officer's positive testimony that he warned [the plaintiff] twice before firing a shot. Consequently, the plaintiff's testimony that he did not *hear* any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given.

*Ford,* 855 F.2d at 1276 (footnote omitted).

In *Klein,* the Seventh Circuit reacted similarly to similar testimony. The *Klein* plaintiff was shot by police who observed him burglarizing a laundromat. 847 F.2d at 369–71. When the plaintiff sued two officers under section 1983, the officers asserted that one of them called out the plaintiff's name, identified himself as a police officer, and told the plaintiff to halt before shooting at him.

---

**4.** Though directed verdict and summary judgment of course occur at two distinct stages of a lawsuit, the standards governing each are similar enough that *Ford*—which principally involved the propriety of a directed verdict—can be used as a comparison point for the present motions for summary judgment. *See Ford,* 855 F.2d at 1274 n. 4.

*Id.* at 370, 373. In response, the plaintiff "merely [said] that he did not *hear* anyone do so." *Id.* at 373. The court, in affirming a grant of summary judgment,[5] concluded: "[W]e find, as did the district court, that it is undisputed that [one of the defendant officers] identified himself as a police officer and ordered [the plaintiff] to halt." *Id.*

Thus, in *Ford, Klein,* and the case at bar, the officers who used force claimed to have shouted a warning before doing so. In each case plaintiffs, instead of affirmatively stating that no preshooting warning was given, state (in the case of *Ford* and *Klein* ) or imply (the case here) only that they never heard such a warning. In two of three cases, the plaintiffs had limited ability to hear a warning: The *Ford* plaintiff was within direct earshot of the officer, but his hearing was impeded by the mask and hood. The Plaintiffs' hearing in this case was impeded by being separated from Melecio, Sr. by a floor of the house. Moreover, in none of the deposition testimony the parties have directed the Court to was any Plaintiff directly asked whether he or she heard any warning on the *second* floor. The Court concludes that in light of *Ford* and *Klein,* Plaintiffs' testimony that they did not hear the agents announce themselves while on the first floor fails to raise a genuine issue of fact regarding whether the agents warned Melecio, Sr. on the second floor.

■ Moreover, even had the agents not warned Melecio, Sr., a warning would not have been required under the circumstances. In *Garner,* the Supreme Court held that an officer seeking to prevent escape of a potentially dangerous felon must deliver a warning "where feasible" before using deadly force. 471 U.S. at 11–12, 105 S.Ct. at 1701–02. Here, the agents were not attempting to stop the escape of a *potentially* dangerous person; rather, they were trying to defend other officers and likely themselves from an *immediately* dangerous person. *See Plakas,* 19 F.3d at 1146 (drawing this distinction between "escape" and "self-defense" excessive

force cases). This Court takes the word "feasible" in the context of *Garner* to mean capable of being performed without prolonging or compounding the threat presented by a suspect. Given the fact that the next second could have brought death to one of Melecio, Sr.'s targets on the ground or to the agents on the second floor, warning Melecio, Sr. before shooting him was not "feasible" so as to have been constitutionally mandatory. In this respect, the Court concurs with the decision in *Liebenstein,* in which police shot and killed a man who was armed, sitting on a porch, and who had been randomly shooting into the surrounding neighborhood for approximately an hour. 826 F.Supp. at 1176–78. The *Liebenstein* court concluded: "[I]n this case, where it was not clear whether a warning would result in further violence and perhaps bloodshed, it is not apparent that a warning would have been feasible." 826 F.Supp. at 1186.

The *Ford* court observed that to survive summary judgment, a party must show that " 'the evidence, taken as a whole, provides sufficient probative basis upon which a jury could reasonably reach a verdict, without speculation.' " *Ford,* 855 F.2d at 1274 n. 4 (quoting *Anderson v. Gutschenritter,* 836 F.2d 346, 348 (7th Cir.1988)); *see also Plakas,* 19 F.3d at 1147 (affirming summary judgment for an officer in a self-defense case where the plaintiff sought to rely on minor inconsistencies in evidence); *Ford,* 650 F.Supp. at 112 (under the directed verdict standard the question is not whether there is a complete lack of evidence favoring the nonmovant but whether there is evidence to properly support a verdict). This Court concludes that only based on speculation could a jury decide to disbelieve the essentially unrefuted testimony of the agents that they warned Melecio, Sr. before shooting him. The Court concludes also that even had the agents not delivered a warning, given the immediate and grave threat to all officers and agents involved, the agents would still

---

**5.** The reliance on *Klein* here should not be seen as an endorsement of the substance of those officer's actions. The shooting in *Klein* occurred prior to the Supreme Court's decision in *Garner* and, as such, was evaluated under the standards that prevailed prior to *Garner.* *Klein,* 847 F.2d

at 371 n. 3. It is unlikely that the actions of the officers in *Klein*—shooting a fleeing suspect who apparently posed little or no immediate threat to the officers or others—would be found constitutional under the *Garner* rule. *See id.*

have acted reasonably within the meaning of the Fourth Amendment.

In sum, the law is clear: Law enforcement officers may use deadly force against persons who threaten death or serious injury to themselves or others. *See Garner,* 471 U.S. at 11, 105 S.Ct. at 1701; *Plakas,* 19 F.3d at 1150 ("use of deadly force was reasonable" and summary judgment was proper where an officer shot a handcuffed suspect swinging a fireplace poker at the officer); *Ford,* 855 F.2d at 1276 (officer "acted reasonably under the circumstances" when he shot a fleeing and probably armed bank robbery suspect after giving two warnings); *Carter,* 973 F.2d at 1333 ("no Fourth Amendment violation" occurred where plainclothes officers shot a suspect they lured to an isolated road to arrest him and the suspect fired at. the officers when the officers revealed their identity); *cf. Estate of Starks v. Enyart,* 5 F.3d 230, 234–35 (7th Cir.1993) (suggesting that an officer would have acted unreasonably if he had voluntarily jumped in front of a fleeing suspect's rapidly moving auto, thereby leaving the apparently unarmed and relatively nonthreatening suspect, whom other officers then shot, no time to brake). That is precisely what the agents did here. Accordingly, the ATF agents are granted summary judgment as to the claims that they violated the Fourth Amendment and section 1983 when they shot Melecio, Sr.

The agents have also argued for summary judgment on the ground of qualified immunity. Indeed, even if the foregoing did not support summary judgment for the agents, qualified immunity certainly would.

 Law enforcement officers may assert the defense of qualified immunity in actions against them founded on the Constitution or federal law. *Liebenstein,* 826 F.Supp. at 1182 (citing *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982)); *Ellis v. Wynalda,* 999 F.2d 243, 245 (7th Cir.1993). Officers enjoy qualified immunity from excessive force suits unless "the unlawfulness of the officer's actions [is] clear in light of pre-existing law." *Enyart,* 5 F.3d at 233; *see also Ellis,* 999 F.2d at 245–46; *Liebenstein,* 826 F.Supp. at 1182–84. Put another way, qualified immunity exists where "at the time of the alleged seizure, a reasonable officer could have believed that [the defendant officer's] conduct was constitutional 'in light of the clearly established law and the information [the officer] possessed' at the time the incident occurred." *Ellis,* 999 F.2d at 246 (quoting *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992)). In effect, "qualified immunity gives the officer the benefit of the doubt." *Liebenstein,* 826 F.Supp. at 1185. Moreover:

> While ordinarily a court grants summary judgment only if no reasonable jury could find for the non-moving party, a court grants summary judgment based on qualified immunity if a reasonable officer could find the defendant's actions justified. When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context, the balance favors the movant.

*Ellis,* 999 F.2d at 246 n. 2. Here, the agents' conduct is in nearly every respect utterly beyond serious constitutional challenge: The agents encountered an individual whom they could reasonably have believed was firing at other law enforcement officers and the agents responded with deadly force. This much of the story is undisputed.

By the Court's estimation, the only aspect of the agents' conduct upon which Plaintiffs have cast even slight doubt is the supposed lack of announcement or warning. But as the foregoing discussion should indicate, whether and in what circumstances the Fourth Amendment requires officers facing danger to themselves or others to deliver a warning before using deadly force is not clearly established beyond the broad command of *Garner* that officers warn "where feasible." Indeed, the situation here is much like that in *Liebenstein,* where, in granting officers summary judgment based on qualified immunity, the court noted that "[n]either party has directed the court to any case law or statute which confer on a suspect the right to be warned before use of deadly force." 826 F.Supp. at 1185. This Court concurs: no clearly established authority mandated that

in this, a particularly dangerous situation, the ATF agents warn Melecio, Sr. before shooting. Thus, the only aspect of the agent's conduct that Plaintiffs have succeeded in even minimally challenging is shielded by qualified immunity. The Court concludes that beyond the inherent reasonableness of the agents' conduct in shooting Melecio, Sr., the agents have qualified immunity from any suit seeking to charge them with liability for that shooting under the Fourth Amendment, either directly under *Bivens* or through section 1983.

■ Plaintiffs have effectively conceded that no ECPD officer was on the second floor at the time Melecio, Sr. was shot. Answer to Req. to Admit No. 2; Memo. Opposing EC Mot. for S.J. at 9. Given this concession that no ECPD officer participated in the shooting of Melecio, Sr., even aside from the fact that the agents who did shoot Melecio, Sr. conducted themselves reasonably there is no basis for holding the ECPD officers liable under section 1983 for the shooting of Melecio, Sr.[6] *See Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983) ("An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis omitted). The ECPD officers are granted summary judgment on Plaintiffs' claims that the officers violated section 1983 with respect to the shooting of Melecio, Sr.

■ Plaintiffs also allege that the City of East Chicago is liable under section 1983 for the shooting of Melecio, Sr. Yet if the ECPD officers did not violate the Fourth Amendment, then the City cannot be liable. *See Plakas,* 19 F.3d at 1150; *Ford,* 855 F.2d at 1277. Accordingly, the City is granted summary judgment with respect to the section 1983 claim arising from the shooting of Melecio, Sr.

Plaintiffs also claim that the ATF agents, ECPD officers, and the City are liable in tort for the shooting of Melecio, Sr., and that the United States is liable under the FTCA based on the tort of the ATF agents.

■ The FTCA waives the sovereign immunity of the United States, allowing it to be sued for the torts of its employees. *See Erxleben v. United States,* 668 F.2d 268, 270–71 (7th Cir.1981). Whether or not an employee commits a tort is governed by the law of the state where the tort allegedly occurred, here, Indiana. 28 U.S.C. § 1346(b). As indicated above, in Indiana an officer is not liable in tort for use of force if the force was privileged. *Meyer v. Robinson,* 992 F.2d 734, 738 (7th Cir.1993). Force is privileged if reasonable under the circumstances. *See id.* For the purposes at hand, this Court sees no significant distinction between the Indiana reasonableness standard and that of the Fourth Amendment. Consequently, the Court concludes that the ATF agents did not commit a tort under Indiana law when they shot Melecio, Sr. Because the United States can be liable under the FTCA only where its employee has committed a tort under applicable state law, the United States is granted summary judgment with respect to the claim arising from the shooting of Melecio, Sr.

■ As for the ATF agents themselves, one might assume it natural at this point to also grant them summary judgment on the claim that the shooting of Melecio, Sr. violated Indiana law. To be precise, however, the agents have not specifically argued this point. Thus, it might be said that no motion is pending before the Court as to the agents' individual liability under Indiana law. Even if this is so, a district court may grant summary judgment *sua sponte* where the party against whom judgment is granted has had a fair opportunity to address the issue adjudged. *See Resolution Trust Corp. v. Ruggiero,* 994 F.2d 1221, 1226 (7th Cir.1993); 10A Charles Allen Wright, Arthur R. Miller & Mary Kay Cain, *Federal Practice & Procedure* § 2720, at pp. 27–35 (2d ed. 1983). Here, whether the ATF agents are liable under Indiana law has been fully argued by both the United States and Plaintiffs in the context of the United States' Renewed Motion for Summary Judgment. Consequently, the Court will extend that argument to the ATF agents and thereby grant them summary judgment on the issue of their individu-

---

**6.** This conclusion eliminates the need to address the ECPD officers' qualified immunity argument.

al liability under Indiana law for the shooting of Melecio, Sr.

■ Neither the ECPD officers nor the City of East Chicago have directly argued that their conduct did not violate Indiana law—their arguments have focused on refuting the section 1983 claims. Nonetheless, it is already established that the ECPD officers did not participate in the actual shooting of Melecio, Sr. and that the agents who did shoot Melecio, Sr. acted reasonably. If Plaintiffs thought some novel feature of Indiana law would enable them to hold the East Chicago Defendants liable in the face of these facts, they have had ample opportunity to raise such an argument. They have not done so. Accordingly, the Court finds it fair to grant *sua sponte* summary judgment to the ECPD officers and the City of East Chicago on the question of whether they violated Indiana law in connection with the shooting of Melecio Sr. *See id.*

### 2. Excessive force against family members

Plaintiffs also seek to hold all Defendants liable for alleged striking and detaining of members of the Maravilla family other than Melecio, Sr. These claims have little substance. First, as already covered, this Court has no subject matter jurisdiction to entertain any individual claims brought by the Maravilla family members against the United States under the FTCA.

■ As for the ATF agents, Plaintiffs charge them with liability under the Fourth Amendment (via *Bivens* and section 1983) and Indiana law for alleged excessive force against members of the Maravilla family. However, in their depositions, Evangelina, Adriana, and Marisela Maravilla all concede that they had no physical contact with the named ATF agents. Evangelina Dep. at 35–36; Adriana Dep. at 97–100; Marisela Dep. at 43–44. In addition, by referring only to the female members of the Maravilla family being struck and detained in their briefs,

Plaintiffs implicitly rule out any such claims by Jesus and Melecio Maravilla, Jr. *See* Memo. Opposing EC Mot. for S.J. at 9. Finally, in their response to the ATF agents' Renewed Motion for Summary Judgment, Plaintiffs did not even address the ATF agents' arguments regarding the claims of excessive force against the family members. Because Plaintiffs' case against the ATF agents on this point has fallen away to virtually nothing, the ATF agents are granted summary judgment with respect to any and all claims that they violated any federal right or committed any violation of state law in their treatment of the Maravilla family.

With regard to the ECPD officers, Plaintiffs have conceded that no evidence links any named ECPD officer with alleged use of excessive force against the family members. Memo. Opposing EC Mot. for S.J. at 9. Consequently, both the ECPD officers and the City of East Chicago are granted summary judgment with respect to any and all of Plaintiffs' claims that members of the Maravilla family were subjected to excessive force by ECPD officers. *See Wolf–Lillie,* 699 F.2d at 867; *Plakas,* 19 F.3d at 1150; *Ford,* 855 F.2d at 1277.

### 3. Planning the arrest

■ The planning of the arrest of Jesus Maravilla is one of the four aspects of the Defendants' conduct that the Plaintiffs advance as a ground for liability. However, as cases cited and discussed above make clear, planning is a form of preseizure conduct that is not subject to Fourth Amendment scrutiny. Consequently, any claims by Plaintiffs that any Defendant is liable under either *Bivens* or section 1983 with respect to the planning of the raid are groundless. Summary judgment is granted as to those claims. This leaves, in theory at least,[7] Plaintiffs' planning claim against the United States under the FTCA and planning claims against the ATF agents, ECPD officers, and the City of East Chicago under Indiana law.

---

7. Early on in this suit, Plaintiffs directly advanced or at least suggested the existence of several "claims" that have since received little or no treatment in motions submitted to the Court. The Court doubts (but makes no assumption) that each of the bases of liability that can be gener-

ously read into Plaintiffs' Amended Complaint is truly a "claim" unto itself in the eyes of Plaintiffs. Rather, the likely crux of this suit is the death of Melecio, Sr. Still, to be fair and thorough, the Court will address each of the claims that Plaintiffs have, in theory, presented.

Plaintiffs suggest that the United States is liable on the ground that the ATF agents acted negligently or recklessly in planning the arrest of Jesus and thereby caused the death of Melecio, Sr. However, planning how to effect an arrest falls within the discretionary function exception to the FTCA, which excludes claims based on exercise of "a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). A district court has no subject matter jurisdiction over a claim that falls within the exception. *See Redmond v. United States by and through the Securities Exchange Comm.,* 518 F.2d 811, 816–17 (7th Cir.1975).

The only aspect of the plan that Plaintiffs point to as possibly wrongful is the ATF agents' reliance on reports of ECPD officers characterizing Melecio, Sr. as a "cop-hater." Even if this reliance were in error (and there is no genuine reason to believe that it was), it would be the type of error that falls within the discretionary function exception. *See Rourke v. United States,* 744 F.Supp. 100, 102–3 (E.D.Pa.1988), *aff'd,* 909 F.2d 1477 (3rd Cir.1990) (applying the exception to FBI agents who mistakenly arrested the plaintiff based on an inaccurate description of a suspect supplied by local law enforcement officers); *Mesa v. United States,* 837 F.Supp. 1210, 1213 (S.D.Fla.1993) ("[T]he function of determining when and how to execute an arrest warrant is quintessentially a discretionary function."); *Patel v. United States,* 806 F.Supp. 873, 878 (N.D.Cal.1992) (suggesting in dicta that decisions regarding "when and where" to execute a search warrant fall within the exception); *Redmond,* 518 F.2d at 817 (suggesting that "how to best fulfill" the federal government's "duty to maintain law and order" is a matter that falls within the exception). Therefore, the Court has no subject matter jurisdiction over Plaintiffs' claim that the United States is liable due to wrongful planning of the arrest of Jesus. Accordingly, that claim is dismissed.

As for the remainder of the planning claims, based on both the dearth of serious attention these claims have had from the parties[8] and the principles allowing *sua sponte* ruling set forth above, the Court grants summary judgment on all such claims.

### 4. Entry into the Maravilla residence

The final aspect of conduct for which Plaintiffs seek to hold the Defendants liable is the way in which the ECT members entered the Maravilla residence. Plaintiffs assert that the agents forced their way into the residence without first knocking or announcing themselves as police. Thus, although Plaintiffs have not articulated it as such,[9] Plaintiffs can fairly be said to advance a claim of a violation of the "knock and announce" rules of the Fourth Amendment and Indiana law. At the outset, the Court notes that it has no subject matter jurisdiction over any such claim Plaintiffs might have against the United States under the FTCA because no such claim was mentioned in the initial claim form filed with the Bureau of Alcohol, Tobacco & Firearms.

As for the ECPD officers and the City of East Chicago, they have asserted, and Plaintiffs have effectively conceded, that no ECPD officer was a member of the ECT that made the initial entry into the Maravilla residence. Since no ECPD officer participated in that entry, neither the ECPD officers nor the City of East Chicago can be liable for that entry. *See Wolf–Lillie,* 699 F.2d at 867; *Plakas,* 19 F.3d at 1150; *Ford,* 855 F.2d at 1277. Accordingly, both the officers and the City are granted summary judgment with respect to any and all of Plaintiffs' claims based on the initial entry into the Maravilla residence.

This leaves only the ATF agents, who did make the initial entry. As noted above: The agents claim that they announced themselves as police, waited for a response, and upon receiving none forced their way into the residence. Four of the Plaintiffs, all of whom were on the first floor and thus presumably fairly well-positioned to hear any such announcement, claimed never to have heard one.

8. *See supra* note 7.

9. *See supra* note 7.

Perhaps Plaintiffs' testimony as to whether or not a warning was given at the ground-level back door carries slightly more weight than it does with respect to whether a warning was given to Melecio, Sr. on the second floor. Still, as in *Ford* and *Klein,* Plaintiffs' testimony amounts to no more than claims that they did not *hear* the agents announce themselves. Moreover, at least one member of the Maravilla family, Marisela, said in her deposition that she was not even fully awake when the raid began. (Tr. 25) It appears that Evangelina and Adriana were awake, based on Marisela's statement that while half asleep she heard her mother and sister talking. *See id.* Neither Melecio, Jr. nor Jesus states in his deposition whether he was asleep or awake when the raid began. Based on *Ford* and *Klein,* the Court concludes that Plaintiffs' testimony that they did not *hear* agents announce themselves as police before entering the residence fails to raise a genuine issue of fact regarding whether the agents did so.

 Moreover, even assuming that the agents did not announce themselves, they were not required to. In most situations, the Fourth Amendment requires that before entering a dwelling to execute a warrant, officers must announce themselves to the persons inside and give those persons an opportunity to allow the officers in freely. *United States v. Singer,* 943 F.2d 758, 761–62 (7th Cir.1991). When justified by exigent circumstances, however, officers may enter a dwelling without first announcing themselves. One such exigent circumstance is when officers believe that announcing themselves will create or aggravate danger to the officers. *Id.; United States v. Buckley,* 4 F.3d 552, 558 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1084, 127 L.Ed.2d 400 (1994).

 Here, the agents knew Jesus Maravilla to be a violator of firearms laws and a reputed streetgang member. The agents also knew that Melecio, Sr. might be in the residence, that he was reputed to hate police officers and to have suggested that he would use force against police officers, and that he was known to carry a gun. These factors amount to exigent circumstances that would have justified the officers in entering the Maravilla residence without first knocking and announcing themselves. *See Buckley,* 4 F.3d at 558 (ruling that officers executing a search warrant would have been justified in dispensing with knocking and announcing when entering a trailer believed to contain firearms and a pit bull); *United States v. Turner,* 926 F.2d 883, 886–87 (9th Cir.1991), *cert. denied,* 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991) (ruling that exigent circumstances existed where the subject of an arrest warrant "had previously expressed his willingness to use firearms against police"); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.2(d) (1987 & Supp.1994). Indeed, the agents' concerns proved well-founded when they discovered Jesus in a room with several guns and Melecio, Sr. shooting out of the window.

 Indiana law similarly includes a general requirement that officers knock and announce themselves before entering a dwelling to execute a warrant. *See Davenport v. State,* 464 N.E.2d 1302, 1305 (Ind.1984), *cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984); *Crabtree v. State,* 479 N.E.2d 70, 73–74 (Ind.Ct.App.1985); Ind. Code Ann. § 35–33–2–3(b) (West 1986). Indiana recognizes an exception to this general rule in cases where announcement before entry might result in destruction of evidence or escape of a suspect. *Davenport,* 464 N.E.2d at 1305; *Crabtree,* 479 N.E.2d at 74. To be precise, this Court has not identified an Indiana decision that names danger to officers as an exigent circumstance justifying dispensing with knocking and announcing before entry. Yet the Court concludes that because officer safety presents an interest at least as compelling as preserving evidence or preventing escape, Indiana would apply the exigent circumstance exception to cases where knocking and announcing would increase danger to officers. *See Ross v. Creighton University,* 957 F.2d 410, 413 (7th Cir.1992) (directing that where no state precedent directly controls a state law issue a federal court must determine how the state's highest court would rule). In this case, the element of surprise the agents would have gained had they not announced themselves before entering would have been justified as

a reasonable measure for ensuring officer safety.

In sum, the Court grants summary judgment against Plaintiffs on their claims that the ATF agents are liable under the Fourth Amendment and Indiana law[10] for failing to knock and announce themselves before entering the Maravilla residence.

To summarize the disposition of this case: Except for the claim that the ATF agents wrongfully shot Melecio Maravilla, Sr., Plaintiffs' claims against the United States under the FTCA are dismissed for lack of subject matter jurisdiction. Summary judgment is granted on all remaining claims in this lawsuit against the United States, the ATF agents, the ECPD officers, and the City of East Chicago.

*CONCLUSION*

For the foregoing reasons, the Motion to Dismiss or in the Alternative for Summary Judgment of the United States is **GRANTED IN PART** and **DENIED IN PART,** the Motion to Dismiss or in the Alternative for Summary Judgment of Malone, Wilson, and Cronin is **DENIED;** the Renewed Motions for Summary Judgment of the United States and Malone, Wilson, Cronin, and Marianos are **GRANTED,** and the Motion for Summary Judgment of the City of East Chicago and Muskin, Rodriguez, Nava, and Flores is **GRANTED.**

This case is **DISMISSED** with prejudice.

---

**10.** This conclusion is not meant in any way to suggest the presence or absence of justification for the federal ATF agents' actions based on supremacy of federal law.